# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AID ATLANTA, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | Case No. 1:17-cv-00872 (TNM) |

## MEMORANDUM OPINION

AID Atlanta provides HIV testing, education, and prevention services to high-risk populations in Atlanta, Georgia. In 2011, the Department of Health and Human Services' Centers for Disease Control and Prevention ("CDC") awarded the organization a grant to implement certain HIV prevention programs. When the project period ended in 2016, the CDC announced a new funding opportunity to provide similar services. AID Atlanta and over 130 other non-profits competed for funding. This time, AID Atlanta did not win a grant, and it now challenges the CDC's denial as arbitrary, capricious, and contrary to federal law in violation of the Administrative Procedure Act ("APA"). The Court finds that the agency's decision was reasonable, sufficiently explained, based on a robust evaluation process, and legally permissible. It will thus grant summary judgment for the Defendants.

## I.

In September 2016, the CDC solicited grant applications through Funding Opportunity Announcement PS17-1704. Defs.' Mem. in Supp. of Mot. for Summ. J. 2, ECF No. 40 ("Defs.' Mem."). The Announcement noted that the agency planned to allocate $50 million to about 30

community-based organizations over a five-year project period (2017 – 2022). *Id*. The goal of the program is to help the selected organizations provide HIV prevention services for high-risk populations across the country. *Id*. Available monies were divided into two service categories; only Category A is relevant here. *Id*. Any nonprofit or organization with a 501(c)(3) IRS status was eligible to apply, so long as the entity could "demonstrate that they have consistently provided HIV prevention or care services to the selected target population(s) for at least the last 24 months." Admin. R. without Category A Redactions 30, ECF No. 41-1 ("J.A.").

The CDC evaluated applications using a three-phase review process. J.A. 40. In the first phase, all received applications were reviewed for completeness and eligibility. *Id*. Next, review panels scored eligible applicants based on several criteria, including the proposed project approach, performance measurement plans, and the organization's implementation capacity. J.A. 40-42. Applicants could score a maximum of 100 points in the Phase II review. *Id*. The total possible score for each evaluative criterion was published in the Announcement. *Id*. For example, an applicant's proposed approach could receive a maximum of 40 points, including up to ten points for the project overview and three points for outreach and recruitment plans. J.A. 40-41. Each Phase II review panel consisted of CDC volunteers who underwent an Objective Review Panel Reviewer training and certified that they had no conflicts of interest with any of the applicants. Explanatory Declaration to Accompany the Admin. R. Filing 4, ECF. No. 33-1 ("McCray Decl.").

In the final review phase, officials conducted a "pre-decisional site visit" for selected applicants. J.A. 43. Organizations could receive a maximum site visit score of 550 points. *Id*. During the site visit, CDC staff further assessed implementation capacity, met with project

management staff and leadership, and conducted a technical review of application components. *Id*.

Final funding determinations were based on applicants' total scores and the "CDC's funding preferences." *Id*. For example, the agency desired to "ensure [an] equitable balance in terms of targeted racial or ethnic minority groups" and to achieve a "balance of funded applicants based on (1) burden of HIV infection within jurisdictions and (2) disproportionately affected geographic areas, as measured by CDC." *Id*.

The CDC combined the overall application scores and its funding preferences using a "Funding Selection Algorithm." McCray Decl. at 7. *See also* J.A. 76-78; 100. To ensure geographically balanced funding, the Algorithm used HIV data from the CDC's "surveillance branch." J.A. 100. This data suggested that, in 2013, 38.5% of the high-risk target population diagnosed with HIV resided in the South. J.A. 82. The agency thus recommended that no more than 40% of the available funding be allocated to organizations from southern states. *Id*. The agency's regional balancing meant that only one Category A service provider would be selected from Georgia. J.A. 84. *See also* J.A. 85 (showing that the CDC decided to select only one service provider per state from Virginia, South Carolina, Mississippi, and Louisiana).

The Algorithm ranked each applicant's combined Phase II and III scores from highest to lowest, then applied the state and regional caps to determine which organizations CDC would fund. J.A. 100-101. From this analysis, 23 organizations were awarded Category A grant money. J.A. 117.

AID Atlanta was one of over 130 organizations that submitted applications. Defs.' Mem. at 10. The Atlanta HARM Reduction Coalition, another Georgia-based provider, also applied for Category A funding. Because the Coalition's application scored higher than AID Atlanta's

3

submission, and because the agency decided to fund only one Georgia provider, AID Atlanta was not awarded a grant. *See* J.A. 117. The Coalition received higher scores during both the Phase II objective review panel and the Phase III site visit. *Id*.

AID Atlanta now contends that the CDC awarded funds "in an arbitrary and capricious manner and in bad faith." Pl.'s Cross-Mot. for Summ. J. 7, ECF No. 42 ("Pl.'s Mem."). AID Atlanta believes that it is the "most successful agency" that has participated in the CDC's HIV prevention programs, and that "the very fact that the CDC denied funding to its most successful partner calls into question the methodology used by the CDC is [sic] choosing its new partners." *Id*. at 2. The organization also states that it has a "Federal assistance relationship" with the CDC and suggests that it was impermissibly defunded in violation of 45 C.F.R. § 75.207. *Id*. at 11.

Naturally, the Federal Defendants disagree. They believe the CDC's funding decisions were based on a "thorough and fair evaluation of the applications submitted." Defs.' Mem. at 10. Both sides have moved for summary judgment based on the administrative record.[1]

## II.

A court must "hold unlawful and set aside agency action, findings, and conclusions" that it determines are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

---

[1] Before filing their summary judgment motions, the parties sparred over the completeness of the administrative record. AID Atlanta sought to include all agency communications relating to the funding opportunity, competitors' responses to the Funding Opportunity Announcement, the resumes for each evaluator who scored Atlanta applications, and other information. *See* February 6, 2018 Order 2-3, ECF No. 35. The Defendants represented that CDC's leadership team relied only on a summary briefing held in February 2017 and documents in already in the record in making its final funding decisions. *Id*. at 2.

The Court denied AID Atlanta's requests to supplement the record and for additional discovery. *Id*. at 4. Under the APA, the Court must evaluate "the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The "whole record" encompasses everything "before the [decision maker] at the time he made his decision." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). The Court found that AID Atlanta "failed to provide any basis for concluding that" the information it sought was before the CDC's leadership team when it made funding decisions. February 6, 2018 Order at 3.

4

with law." 5 U.S.C. § 706(2)(A). The scope of this review is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, it must determine whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id*. (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An agency's decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*.

As the "party challenging an agency's action as arbitrary and capricious," AID Atlanta "bears the burden of proof." *Lomak Petroleum, Inc. v. Fed. Energy Reg. Comm'n*, 206 F.3d 1193, 1198 (D.C. Cir. 2000). The arbitrary and capricious review standard is a "[h]ighly deferential" one that "presumes the validity of agency action." *Hagelin v. Fed. Election Comm'n*, 411 F.3d. 237, 242 (D.C. Cir. 2005). It is "not enough for the agency decision to be incorrect; so long as it has some rational basis, the court is bound to uphold the decision." *New Life Evangelistic Ctr. v. Sebelius*, 753 F. Supp. 2d 103, 113 (D.D.C. 2010). Summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and [is] otherwise consistent with the APA standard of review." *Alston v. Lew*, 950 F. Supp. 2d 140, 143 (D.D.C. 2013).

### III.

Far from being arbitrary and capricious, the CDC's funding decisions here appear to have been based on a rational, thorough, and impartial evaluation. The agency established and

5

published a multifaceted proposal review process, followed that process in assessing applications, and complied with applicable federal laws and regulations. AID Atlanta's assertions to the contrary are unpersuasive.

*First*, the organization alleges that the CDC's decision "cannot be justified given AID Atlanta's prior performance." Pl.'s Mem. at 8. According to a 2014 – 2015 CDC report, AID Atlanta "did an excellent job describing program promotion and client recruitment efforts implemented during the reporting period that have proven effective in reaching and actively engaging in the target population." *Id*. at 9. From 2015 – 2016, the organization's HIV testing led to the identification of "124 new HIV positive persons," or "12% of all newly identified HIV positive persons" from organizations receiving CDC funding for HIV testing that year. *Id*. AID Atlanta believes this data shows that "CDC itself admitted and acknowledged that AID Atlanta was its most successful agency." *Id*. at 2. Because of its "stellar performance," the organization urges the Court to conclude that the CDC's award decisions could not have had a rational basis. *Id*. at 10.

This conclusion is a step too far. While AID Atlanta's performance under prior funding programs may well have been exemplary, there is no evidence suggesting that the CDC failed to consider and credit this past performance. For example, the Phase II Review featured several categories directly relevant to AID Atlanta's experience and capabilities, including:

- Targeted HIV Testing (worth 9 points);
- Program Promotion, Outreach, and Recruitment (3 points);
- Experience and credibility in working with the target population (5 points);
- Substantial experience providing HIV prevention services (5 points); and
- Staff members' experience working with the target population (7 points). J.A. 40-42.

6

As the maximum possible Phase II score was 100 points, 29% of this total was awarded based on applicants' history of and experience with HIV prevention and client recruitment efforts. *See id*. Similarly, during Phase III of the review, CDC officials "further assess[ed] an applicant's capacity to implement the proposed program," and "identifie[d] unique programmatic conditions that may require further training, technical assistance, or other CDC resources." J.A. 43. Simply put, an organization's demonstrated ability to successfully perform the services being sought is rationally related to the decision to fund that organization, and the record suggests that the CDC assessed this ability.

But past performance is just one of several factors that the CDC considered. After all, past performance is no guarantee of future results. And the other evaluation categories were also rationally related to the agency's stated purpose of reducing HIV-related "morbidity, mortality, and related health disparities" among vulnerable populations. J.A. 4. Phase II of the review assessed, for instance, organizations' formalized collaborations and partnerships with HIV medical care providers, performance management plans and strategies, proposed work plans, and workforce development and training efforts. J.A. 40-42. Partnerships within the medical community, a capacity to measure progress, project planning, and training are unquestionably related to an organization's ability to successfully implement the HIV prevention programs for which it seeks funding.

The decision to cap the number of service providers selected from each state was also rationally related to the agency's stated goals. It expressed a desire to balance funding to serve "disproportionately affected geographic areas, as measured by CDC," and it sought to "fully maximize the impact of CDC's fiscal resources." J.A. 41. Given these objectives, it was

7

reasonable for the agency to measure the prevalence of HIV infection rates and implement state funding caps proportional to those rates.

The CDC ultimately made two decisions that led to the denial of funding to AID Atlanta. The first was that the agency would only select one service provider from Georgia to receive Category A funding. This decision was a reasonable effort to secure funding for disproportionately affected regions and maximize the reach of the CDC's limited resources. The second was to select the highest scoring service provider from Georgia. AID Atlanta's Phase II score was three points lower than the Atlanta HARM Reduction Coalition's score. J.A. 117. Its Phase III score was 26 points lower. Because the Coalition received the highest scores of any organization applying from Georgia, and because the scoring was based on criteria rationally related to the CDC's program goals, the CDC appropriately selected the Coalition as the sole funding recipient for Georgia.

*Second*, AID Atlanta contends that the decision to deny the organization funding violates the provisions of 45 C.F.R. Part 75. They contend that "an agency that has been receiving federal funds cannot have its program defunded as a result of any issues that can be rectified." Pl.'s Mem. at 11. The CDC allegedly "terminated" the organization's funds based on a "wholly discretionary decision unrelated to the furtherance of the federal program" in violation of 45 C.F.R. § 75.207. *Id*.

AID Atlanta's argument is based on a misapplication of the regulatory provisions it cites. 45 C.F.R. § 75.207 lists the circumstances under which the CDC "may impose additional specific award conditions" upon two categories of organizations: current, non-compliant recipients of CDC funding under an existing grant, or applicants that have been selected for funding under a new award. For Funding Opportunity PS17-704, AID Atlanta is neither.

8

True, from 2011 – 2016, the organization received CDC money to provide HIV prevention services substantially similar to those sought by PS17-704. But the funds AID Atlanta received during those years were awarded through a distinct Funding Opportunity, PS11-1113. Pl.'s Mem. at 3. And, as the organization concedes, that grant expired and "was replaced by" PS17-704. *Id.* PS17-704 was announced as a new opportunity to perform work that "builds upon previous and current HIV prevention programs," including PS11-113. J.A. 5. AID Atlanta was not selected to receive funding under the new opportunity, and the CDC did not terminate any funding AID Atlanta was receiving under an existing grant that it has been awarded. Thus, the provisions of 45 C.F.R. Part 75 are inapplicable.

**IV.**

For these reasons, the Defendants' Motion for Summary Judgment will be granted, and the Plaintiff's Cross-Motion for Summary Judgment will be denied. A separate order will issue.

Dated: October 29, 2018                                        TREVOR N. MCFADDEN, U.S.D.J.